IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CV-00049-FL

| | |
|---|---|
| TUAN H. NGUYEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AUSTIN QUALITY FOODS, INC., | ) |
| KEEBLER COMPANY, INC., and | ) |
| KELLOGG COMPANY, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND
RECOMMENDATION**

This matter is before the court on the summary judgment motion of Defendants Keebler

Company, Inc., Kellogg Company, and Austin Quality Foods, Inc. (collectively, "Defendants").

[DE-21]. Plaintiff Tuan H. Nguyen ("Plaintiff") has responded in opposition to Defendants' motion

[DE-26], and Defendants have replied [DE-29]; accordingly, the matter is ripe for disposition. The

parties have not consented to jurisdiction of the magistrate judge; therefore, the motion is considered

here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil

Rule 72.3(c). For the reasons set forth below, it is recommended that Defendants' motion for

summary judgment be granted.

## I. BACKGROUND

On February 9, 2012, Defendants removed this action from Wake County Superior Court to

this court on the basis of diversity jurisdiction. Plaintiff alleges that Defendants terminated his

employment for filing a workers' compensation claim in violation of the North Carolina Retaliatory

Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-240, *et seq.*, and North Carolina

public policy. [DE-1-1]. Plaintiff also contends that he was discriminated against of the basis of his

disability, race and national origin, in violation of North Carolina's public policy. Plaintiff seeks monetary relief, including punitive damages, as well as injunctive relief. On February 16, 2012, Defendants filed an Answer, generally denying the allegations and raising several affirmative defenses, including that Plaintiff was terminated for legitimate, non-discriminatory reasons. [DE-8]. On January 31, 2013, Defendants filed the instant motion for summary judgment with respect to all of Plaintiff's claims.

Plaintiff was born in 1961 in Vietnam, where he attended college, receiving a B.S. in Mathematics, and worked as a Math teacher before immigrating to the United States in 2006. Dep. of Tuan H. Nguyen ("Nguyen Dep.") [DE-21-1] 10:11-12, 15:2-17, 18:8-20 & Ex. 2 [DE-21-2]. Defendant Austin Quality Foods, Inc. ("Austin Foods"), a wholly owned subsidiary of Defendant Keebler Foods Company,[1] operates a manufacturing plant in Cary, North Carolina (the "plant") where Cheez-It crackers, peanut butter-filled crackers, and cheese-filled crackers are produced for global distribution. Decl. of Gloria Brenda Moses ("Moses Decl.") ¶ 5 [DE-21-4].

In 2006, a staffing company hired Plaintiff to work at the plant as a temporary employee loading pallets. Nguyen Dep. 28:1-6 & 18-23. In August 2007, Austin Foods hired Plaintiff to work at the plant in a permanent capacity. Dep. of Brenda Moses ("Moses Dep.")[2] [DE-26-4] Ex. 41 § II. During the period Plaintiff worked for Austin Foods, more than seven hundred people, representing forty-eight countries worked in the plant, including Plaintiff's father, who has since

---

[1] According to the financial disclosures filed in this case, the Defendant corporations are related as follows: Austin Quality Foods, Inc. is a wholly owned subsidiary of Keebler Foods Company (the Defendant named as Keebler Company); Keebler Foods Company is a wholly owned subsidiary of Keebler Holding Corporation; Keebler Holding Corporation is a wholly owned subsidiary of Kellogg USA, Inc.; and Kellogg USA Inc. is a wholly owned subsidiary of Kellogg Company. [DE-4 & 5].

[2] Various excerpts from the Moses deposition were filed by both parties and can be found at Docket Entry numbers 21-5, 26-3, and 29-3.

retired, and Plaintiff's mother, who continues to work at the plant. *Id.* 77:11-20, 79:3-11, 182:2-15 & Ex. 41 § I.

Plaintiff worked in various positions at the plant, but relevant to the claims presented here, Plaintiff operated machine number 101, which assembles peanut butter sandwich crackers. Aff. of Tuan Nguyen ("Nguyen Aff.") [DE-25] ¶ 2; Nguyen Dep. 73:8-18. Plaintiff's duties on machine number 101 generally included monitoring the machine, clearing product "hang-ups" in the machine, and cleaning the machine. Nguyen Dep. 73:10-25; Dep. of Carmen Bloomfield ("Bloomfield Dep.")[3] [DE-26-1] 7:16-8:4. The crackers are picked up by a pin chain and carried down the cracker line to the stencils, which put the peanut butter onto the crackers. Dep. of Verna Elliot ("Elliot Dep.")[4] [DE-26-3] 16:15-17:5. The stencils leak in varying degrees and peanut butter drips from the stencils onto a ledge of the machine. *Id.* 17:4-5. At the time Plaintiff worked on machine number 101, the official cleaning procedure entailed reaching under the stencils with an L-shaped tool to scrape or rake the peanut butter drippings from the machine's ledge. *Id.* 20:2-11. In order to assist with cleaning, Plaintiff inserted a piece of cardboard or a "slip sheet" under the stencils onto the ledge to catch the dripping peanut butter, and Plaintiff changed the slip sheet as needed, typically three times per day. Nguyen Aff. ¶ 2; Nguyen Dep. 148:9-18. A slip sheet can be placed under the stencils and removed without the operator placing a hand inside the machine. *See, e.g.*, Bloomfield Dep. 26:3-8, 29:19-30:5; Moses Dep. 55:6-56:5. While use of a slip sheet was not part of the official

---

[3] Various excerpts from the Bloomfield deposition were filed by both parties and can be found at Docket Entry numbers 21-6 and 26-1.

[4] Various excerpts from the Elliot deposition were filed by both parties and can be found at Docket Entry numbers 21–5 and 26-3.

3

cleaning procedure, Elliot Dep. 20:2-11, other machine operators utilized a slip sheet and Plaintiff's supervisor was aware of this practice, Dec. 11, 2012 Aff. of Robert Williams ("2012 Williams Aff.") [DE-24] ¶ 5.

Generally, employees at the plant are trained to never put their hands into a piece of moving equipment. Dep. of Cheryl Judd ("Judd Dep.") [DE-21-7] 38:6-18; Elliot Dep. 121:22-122:1; Bloomfield Dep. 29:14-18; Dep. of Lonnie Britton ("Britton Dep.") [DE-21-8] 12:15-20; Dep. of Jon Nay ("Nay Dep.")[5] [DE-21-9] 12:7-14. Employees are trained on two acceptable ways to stop a machine's parts from moving: "lockout/tagout" and "two points of control." Elliot Dep. 42:23-43:14. The lockout/tagout policy provides "the framework for all training, to make sure people understand how to lock out a piece of equipment, to de-energize it and lock it out so that when they go into a piece of equipment, that it cannot move and cause them injury." *Id.* 32:3-10. To utilize lockout/tagout, the employee engages a disconnect behind the machine and puts a lock and tag on it, and the machine can only be unlocked and re-energized with the machine operator's key. *Id.* 43:7-14. Lockout/tagout is typically used in the event a machine requires extensive cleaning or repair. Judd Dep. 31:7-21; Nay Dep. 61:10-23.

To utilize two points of control, the employee presses an E-stop button on the machine and raises a safety interlock guard. Elliot Dep. 35:7-8. Under OSHA regulations, two points of control may only be utilized for normal production operations that are routine, repetitive, and integral to the production process, *i.e.*, events occurring multiple times during a shift. *Id.* 34:18-35:8, 36:3-6. Such "normal operations" would include unjamming crackers from the machine. *Id.* 35:14-36:6. Plaintiff

---

[5] Various excerpts from the Nay deposition were filed by both parties and can be found at Docket Entry numbers 21-9, 26-2, and 29-4.

received safety training, including lockout/tagout and machine guarding training, on January 22, 2009, March 10, 2009, March 26, 2009, and June 18, 2009, although he did not understand everything that was presented due to his lack of proficiency in English. Nguyen Dep. 59:7-23 & Exs. 20-25.

On July 13, 2009, while Plaintiff was operating machine number 101, he inserted a slip sheet into the machine to catch dripping peanut butter. Nguyen Aff. ¶ 2. Plaintiff routinely placed and removed slip sheets without incident, however, on this occasion, the corner of the slip sheet unexpectedly bent. Nguyen Dep. 148:19-149:6. Plaintiff was concerned that the bent slip sheet would damage the machine, and he instinctively reached into the machine to straighten or pat down the corner of the slip sheet. *Id.* 148:4-8. When Plaintiff reached into the machine, his left hand was caught by the pin chain, resulting in the amputation of the first digit of three fingers on his left hand. Nguyen Aff. ¶ 2; Nguyen Dep. 93:5-17; Elliot Dep. 17:6-20.

Plaintiff was taken to the hospital, accompanied by a co-worker, John Nay, who also spoke Vietnamese and English. Nguyen Dep. 102:1-2. Verna Elliot, the plant safety manager, met Plaintiff at the hospital and contacted the workers' compensation carrier, who sent a case manager to the hospital. Elliot Dep. 9:2-18. Elliot then returned to the plant to investigate the accident. *Id.* 15:19-24. Based on the investigation, Elliot determined that Plaintiff was injured when he bypassed a safety guard, reaching into the machine to pat down the curled corner of the slip sheet, which she considered to be a lockout/tagout and machine guarding violation. Elliot Dep. 16:1-5, 16:24-17:20.

A workers' compensation claim was filed for Plaintiff on July 15, 2009, and he received benefits until August 16, 2009, when Plaintiff's doctor approved his return to light duty work on a

5

trial basis. Nguyen Aff. ¶¶ 3-4. Plaintiff returned to the plant on August 17, 2009, with his doctor's note, and was called into a meeting with Elliot, Brenda Moses (the Human Resource Manager), and Ruby Dao (an employee who spoke both Vietnamese and English). *Id.* ¶ 4. Moses asked Plaintiff to explain what happened on the day of his accident, which he did, and Moses confirmed with Plaintiff that he had received training with respect to lockout/tagout and two points of control. *See* Aug. 17, 2009 Memo. of Brenda Moses, Defs.' Bates No. DEF000268 [DE-21-2]. Moses informed Plaintiff that he was suspended pending further investigation, Moses Dep. 39:9-12, and on August 27, 2013, Plaintiff was terminated for violating the plant's lockout/tagout policy, Nguyen Aff. ¶ 5. Plaintiff has been unable to find work since his employment at the plant was terminated. *Id.* ¶ 13.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "that there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When the moving party has carried its burden under Rule 56, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations & footnote omitted) (quoting Fed. R. Civ. P. 56). The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

6

242, 255 (1986). However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. Fed. R. Civ. P. 56(a); *see Anderson*, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. ANALYSIS

### A. REDA Claim

REDA prohibits discrimination or retaliation against an employee for, *inter alia*, filing a workers' compensation claim. N.C. Gen. Stat. § 95-241(a)(1); *Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004) (citation omitted). To state a claim under REDA, a plaintiff must show that "(1) he exercised his right to engage in a protected activity, such as filing a workers' compensation claim; (2) he suffered an adverse employment action[;] and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action." *Smith v. Computer Task Grp., Inc.*, 568 F. Supp. 2d 603, 613 (M.D.N.C. 2008) (footnote omitted) (citing *Wiley*, 164 N.C. App. at 186, 594 S.E.2d at 811). "Although evidence of retaliation . . . may often be completely circumstantial, the causal nexus between protected activity and retaliatory discharge must be something more than speculation." *Swain v. Elfland*, 145 N.C.App. 383, 387, 550 S.E.2d 530, 534 (2001).

"If a plaintiff presents a prima facie case of retaliatory termination, the burden shifts to the defendant to show, by a preponderance, that it 'would have taken the same unfavorable action in the absence of the protected activity of the employee.'" *Smith*, 568 F. Supp. 2d at 613 (quoting N.C. Gen. Stat. § 95-241(b)); *see Webb v. K.R. Drenth Trucking, Inc.*, 780 F. Supp. 2d 409, 413 n.2

(W.D.N.C. 2011) (noting that the burden shifting analysis in a REDA claim is provided by "the terms of the statute itself."). "'[T]he employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons.'" *Fatta v. M & M Props. Mgmt., Inc.*, — N.C. App. —, 727 S.E.2d 595, 599 (2012), *disc. review denied*, 735 S.E.2d 182 (N.C. 2012) and 743 S.E.2d 182 (N.C. 2013). "[P]laintiff then has to demonstrate that the apparently valid reason was actually a pretext for discrimination." *Id.* (quoting *Lilly v. Mastec N. Am., Inc.*, 302 F. Supp. 2d 471, 481 (M.D.N.C. 2004)).

Plaintiff alleges that he was terminated for filing a workers' compensation claim. There appears to be no dispute that Plaintiff has satisfied the first two elements of a REDA claim–that he exercised his right to engage in protected activity by filing a workers' compensation claim and that he suffered an adverse employment action when his employment was terminated. However, Defendants contend that Plaintiff has failed to establish a *prima facie* case, because he cannot show a causal connection between the filing of his claim and his termination or that, alternatively, Defendants would have taken the same action in the absence of Plaintiff's protected activity. Plaintiff contends that summary judgment should be denied because (1) evidence of close temporal proximity between the filing of his claim and his termination is sufficient to establish a causation; (2) there is sufficient evidence of a pattern of conduct to establish causation; and (3) there is a genuine issue of material fact as to whether Defendants' asserted motive was pretextual.

## 1. Temporal Proximity

Close temporal proximity between the protected activity and the adverse employment action may be used to satisfy the causation element of a REDA claim. *See Roberson v. Paul Smith, Inc.*,

8

No. 5:07-CV-284-F, 2011 WL 683900, at *8 (E.D.N.C. Feb. 18, 2011); *Smith*, 568 F. Supp. 2d at 614. However, "[c]ourts have established the general parameters of close temporal proximity for purposes of REDA on a case-by-case basis." *Smith*, 568 F. Supp. 2d at 614 (footnote omitted). "At one extreme, courts have found a time period of approximately one month or less to constitute close temporal proximity." *Id.* (citing *Lilly*, 302 F. Supp. 2d at 481-82 (one day); *Martin v. Nationwide Mut. Ins. Co.*, No. 1:99CV00956, 2001 WL 604192, at *9-10 (M.D.N.C. Apr. 20, 2001) (less than one month)). "At the other extreme, courts have held a time period of more than two and one-half months to constitute the absence of close temporal proximity." *Id.* (citing *Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 691, 575 S.E.2d 46, 50 (2003) (approximately eighty-one days); *Brown v. Sears Auto. Ctr.*, 222 F. Supp. 2d 757, 764 n.10 (M.D.N.C. 2002) (at least three months); *Shaffner v. Westinghouse Elec. Corp.*, 101 N.C. App. 213, 216, 398 S.E.2d 657, 659 (1990) (two and one-half to three months)). Accordingly, "[a] grey area appears to exist for periods between one month and two and one-half months." *Id.* at 615.

The parties disagree as to which dates are relevant for the temporal proximity inquiry. Plaintiff suggests that the date Plaintiff engaged in protected activity is either the date Plaintiff's claim was filed, July 15, 2009, or the date Defendants began paying benefits, July 21, 2009, whereas Defendants suggest that the relevant date is the date of injury, July 13, 2009. Plaintiff cites no authority for the proposition that the date a plaintiff first receives benefit payments is relevant to when a plaintiff engaged in protected activity. Likewise, Defendants cite no authority for the proposition that being injured is protected activity. However, REDA expressly defines "the filing of a claim" as protected activity. *See* N.C. Gen. Stat. § 95-241(a)(1) (prohibiting discrimination or

9

retaliation against an employee for filing a claim or complaint, initiating an inquiry, investigation, inspection, proceeding or other action, or testifying or providing information with respect to a claim). Therefore, the date on which Plaintiff engaged in protected activity for the purpose of temporal proximity analysis is July 15, 2009, the date on which Plaintiff's workers' compensation claim was filed.

With respect to the date on which Plaintiff suffered an adverse employment action, Plaintiff suggests it is the date on which Plaintiff was suspended, whereas Defendant suggests it is the date on which Plaintiff's employment was terminated. For purposes of REDA, an adverse or retaliatory action is defined to include suspension as well as termination. N.C. Gen. Stat. § 95-240(2). Furthermore, to consider only the termination date in the temporal proximity analysis would allow a defendant to avoid a finding of close temporal proximity by merely suspending an employee for a period of time prior to terminating employment. *Cf. McDowell v. Cent. Station Original Interiors, Inc.*, 211 N.C. App. 159, 165, 712 S.E.2d 251, 255 (2011) ("By simply delaying the retaliatory firing for several months, an employer could prevent a REDA claim from ever going forward, even where there is direct evidence of a wrongful motive.") (quoting *Tarrant v. Freeway Foods of Greensboro, Inc.*, 163 N.C. App. 504, 511, 593 S.E.2d 808, 813 (2004)). Therefore, the date of Plaintiff's suspension, August 17, 2009, is the date Plaintiff suffered an adverse employment action for the purpose of temporal proximity analysis.

Here, Plaintiff's workers' compensation claim was filed on July 15, 2009, and Plaintiff was suspended on August 17, 2009, thirty-three days after the claim was filed. Nguyen Aff. ¶¶ 3-4. Therefore, the temporal proximity between the protected activity and the adverse action falls into

10

the grey area of more than one month, but less than two and one-half months and is insufficient, standing alone, to establish as a matter of law the causal connection element of Plaintiff's *prima facie* case. Moreover, the timing of Plaintiff's suspension corresponds with Plaintiff's return to the plant after his doctor released him to return to light duty work, which was prior to the completion of Defendants' investigation into Plaintiff's accident. Elliot Dep. 63:18-64:2; Moses Dep. 38:3-14. This undermines any inference that the suspension was related to the filing of Plaintiff's workers' compensation claim, rather than the continuing investigation into Plaintiff's accident and potential safety violation. Furthermore, other evidence of record militates against a causal connection between Plaintiff's workers' compensation claim and his suspension and termination. *See Edwards v. PCS Phosphate Co., Inc.*, 812 F. Supp. 2d 689, 695 (E.D.N.C. 2011) ("Temporal proximity is a factor to be weighed along with direct and circumstantial evidence of causation or non-causation presented by the parties. It is not alone dispositive.").

On the day of Plaintiff's accident, the plant safety manager initiated the workers' compensation claims process for Plaintiff and Plaintiff did, in fact, receive benefits until his doctor authorized a trial return to light duty work as of August 16, 2013. *See Dunsmuir v. May Dep't Stores Co.*, No. 04-1413, 120 F. App'x 927, 930 (3d Cir. 2005) ("The notice to the claims department of [plaintiff's] injury on the very day of his accident further attenuates any inference of causation between [plaintiff's] collection of benefits and his subsequent termination."); *Salter*, 155 N.C. App. at 692, 575 S.E.2d at 50 (affirming grant of summary judgment to defendant on REDA claim based on lack of causal connection and noting, among other things, that defendant "filed all necessary papers for plaintiff to receive benefits, and plaintiff indeed received them."). Plaintiff makes much

11

of the fact that a Notice of Termination of Compensation by Trial Return to Work was filed with the North Carolina Industrial Commission on August 21, 2009, four days after Plaintiff was suspended and that later Defendants contested continued payment of Plaintiff's workers' compensation benefits. However, this evidence is insufficient to establish a genuine issue of material fact with respect to causation for several reasons.

First, Plaintiff's doctor did in fact release him for a trial return to work on August 16, 2009, and Plaintiff was prohibited by Defendants from working, not because of his injury, but rather because of the ongoing investigation into the potential safety violation. Elliot Dep. 63:18-64:2; Moses Dep. 38:3-14. Next, a third-party claims administrator handled workers' compensation claims on Defendants' behalf, and there is no evidence that Defendants interfered in or influenced the process. Elliot Dep. 64:10-22. *See Smith*, 568 F. Supp. 2d at 616 n.17 (noting, as an example of the "problematic" nature of the plaintiff's "purported evidence of a causal connection," that the plaintiff offered no credible evidence that the defendant played any role in the decision of its third-party administrator, which had sole discretion to accept or deny a workers' compensation claim). Finally, the fact that Defendants' third-party claims administrator challenged Plaintiff's right to continued workers' compensation benefits after Plaintiff's doctor cleared Plaintiff for light duty work does not support Plaintiff's contention that Defendants terminated his employment for filing a workers' compensation claim. *Cf. Abels v. Renfro Corp.*, 335 N.C. 209, 219, 436 S.E.2d 822, 828 (1993) (distinguishing, for the purposes of res judicata, between compensability under the Workers' Compensation Act and whether a plaintiff was discharged for filing a workers' compensation claim). Plaintiff has presented nothing more than speculation that a causal connection exists between the

12

filing of his workers' compensation claim and his suspension and subsequent termination, which is insufficient to show retaliation. *See Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 237, 382 S.E.2d 874, 882 (1989) ("This Court is not unmindful that circumstantial evidence is often the only evidence available to show retaliation against protected activity. Nevertheless, the causal connection must be something more than speculation[.]") (internal citations omitted).

In sum, the temporal proximity of the protected activity and adverse employment action is not sufficiently close to establish, as a matter of law, the causation element of Plaintiff's *prima facie* case, and other evidence of record does not support a finding of causal connection.

## 2.    Pattern of Conduct

A pattern of conduct may also satisfy the causation element for a REDA claim. *See Smith*, 568 F. Supp. 2d at 614. Plaintiff contends that, at the time of his accident, machine operators were allowed to place and remove slip sheets while the machines were running and that employees receiving only minor injuries were not disciplined or terminated. The evidence does not support Plaintiff's contention.

Plaintiff is correct that multiple employees testified that, at the time of Plaintiff's accident, some machine operators used slip sheets and generally believed that it was acceptable to place and remove a slip sheet while the machine was running. *See* 2012 Williams Aff. ¶ 5; Nay Dep. 17:13-20; Bloomfield Dep. 9:10-20, 11:2-5; Dep. of Shahin Choudhoury ("Choudhoury Dep.") [DE-26-5] 12:1-13, 17:9-17. *But see* Bloomfield Dep. 11:7-13 (stating that the machine must be stopped to insert the slip sheet). Yet, Plaintiff was not injured during the routine placing or removing a slip sheet, which he had done many times in the past without incident. It is uncontested that Plaintiff was

13

injured when he *reached into the machine*, farther than he had done in the past, to pat down the corner of the slip sheet which had bent or curled. Nguyen Dep. 92:18-94:12. Other employees testified that it is not necessary to reach into the machine, as Plaintiff did when he was injured, to simply place or remove a slip sheet, Bloomfield Dep. 26:3-8, 29:19-30:5; Moses Dep. 55:6-56:5, and that it is never acceptable to reach into a moving machine, Judd Dep. 38:6-18; Elliot Dep. 121:22-122:1; Bloomfield Dep. 29:14-18; Britton Dep. 12:15-20; Nay Dep. 12:7-14. Even Plaintiff acknowledged that it would be "abnormal and dysfunctional" to put one's hand into a machine and that he did so instinctively rather than intentionally. Nguyen Dep. 92:18-21, 147:12-22. Furthermore, with respect to the other employees with minor or non-compensable injuries, who were allegedly not disciplined or terminated, there is no evidence that they were injured by reaching into a moving machine, as was Plaintiff, or that they violated any other safety rule. Accordingly, the alleged pattern of conduct is insufficient to satisfy the causation element of Plaintiff's *prima facie* case.

### 3. Pretext

Even assuming, *arguendo*, that Plaintiff had established a *prima facie* case under REDA, an employer may avoid liability by showing, by a preponderance of the evidence, that it "would have taken the same unfavorable action in the absence of the protected activity of the employee." N.C. Gen. Stat. § 95–241(b). To find that a genuine issue of material fact exists as to whether the apparently valid reason was actually a pretext for retaliation, it is "not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Fatta*, 727 S.E.2d at 600 (quoting *Enoch v. Alamance Cnty. Dep't of Soc. Servs.*, 164 N.C. App. 233,

14

242, 595 S.E.2d 744, 752 (2004)).

Here, Defendants contend that Plaintiff's employment was terminated because Plaintiff violated Defendant's lockout/tagout policy by reaching his hand into a moving machine, constituting a violation of a published Group I work rule, which stated that "carelessness or recklessness resulting in a serious accident to an Associate" will result in immediate discharge. *See* Aug. 17, 2009 Corrective Action Interview, Defs.' Bates No. DEF000299 [DE-29-1]; Moses Dep. Ex. 15 at 22. Plaintiff contends that this proffered reason is pretext, as evidenced by testimony from other employees, including Plaintiff's former supervisor, that Plaintiff did not violate lockout/tagout policy. Plaintiff also relies on the fact that other employees not engaged in protected activities were not disciplined for violating lockout/tagout and that Defendants challenged his workers' compensation claim. The evidence does not support Plaintiff's contention that Defendants' proffered reason for terminating his employment was a pretext for retaliation.

First, a close reading of the testimony of the plant employees reveals that they were consistent in the understanding that while placing or removing a slip sheet would not violate lockout/tagout policy, reaching one's hand into a moving machine would violate company policy. Jan 29, 2013 Declaration of Robert Williams ("2013 Williams Decl.") [DE-29-2] ¶ 7, Judd Dep. 38:6-18; Elliot Dep. 121:22-122:1; Bloomfield Dep. 29:14-18; Britton Dep. 12:15-20; Nay Dep. 12:7-14. Plaintiff's argument that lockout/tagout is used only for extensive cleaning or repair and that two points of control is used only for clearing jams, so that neither applies to Plaintiff's situation, misses the mark. While the safety videos used to train employees on lockout/tagout do discuss its use in the context of service and repair of machinery, Nguyen Aff. Exs. H & I (Lockout/Tagout training videos), it is

15

apparent from the testimony of plant employees that lockout/tagout has broader application in practice, *see, e.g.*, Bloomfield Dep. 29:8-18. This is consistent with the plant safety manager's testimony that the lockout/tagout policy provides "the framework for all training, to make sure people understand how to lock out a piece of equipment, to de-energize it and lock it out so that when they go into a piece of equipment, that it cannot move and cause them injury." Elliot Dep. 32:3-10. Ultimately, whether Plaintiff should have utilized lockout/tagout or two points of control is immaterial, because it is uncontraverted that it is never acceptable for an employee to reach into a moving machine, which is precisely what Plaintiff did when he was injured. *See* Elliot Dep. 128:13-22 ("The two points of control is the minimum that you can do. [Plaintiff] had neither two points of control nor lock-out tag out. [Plaintiff] put his hand into a piece of moving equipment.").

Next, Defendants contend that comparator evidence shows that they would have taken the same action despite the protected conduct. Defendants assert that during 2009, at least five other employees were terminated for violating plant rules and none was injured or presented a workers' compensation claim in connection with the incident giving rise to their termination of employment. Moses Decl. ¶ 6. Also during 2009, twelve employees were injured while working, including Plaintiff, but only Plaintiff was disciplined in connection with the accident, because the others did not violate a work rule in connection with the accident. *Id.* ¶ 7. Between 2007 and 2011, at least nine employees, including Plaintiff, filed workers compensation claims, and each of the other employees returned to work, because there was no work rule violation, and each continues to work at the plant. *Id.* ¶ 8.

Plaintiff objects to the consideration of this evidence, arguing that it is inadmissible under

16

Rule 403 of the Federal Rules of Evidence, because to establish the inference Defendants are attempting to make would require a trial on each employee's specific incident. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The North Carolina Supreme Court has held that a defendant is entitled to present comparator evidence in a retaliation case. *See Abels v. Renfro Corp.*, 335 N.C. 209, 217-18, 436 S.E.2d 822, 826-27 (1993) (holding that is was error for the trial court to prohibit a defendant from introducing evidence of its treatment of similarly situated employees).

In *Abels*, the defendant attempted to introduce evidence of the discharge for poor quality work of other employees who never filed workers' compensation claims and evidence of other employees who filed workers' compensation claims and returned to work without incident. *Id.* at 216. The court observed that the evidence was offered to rebut the plaintiff's assertion that she was fired because defendant anticipated her filing a workers' compensation claim as a result of her injuries. *Id.* In allowing the introduction of such evidence, the court stated that "[t]he employer's primary defense in these cases rests upon its ability to present evidence that the employee was fired for other reasons," noting that "federal courts have long allowed this type of comparative evidence in employment discrimination cases." *Id.* at 217-18 (citations omitted). The court further reasoned,

> In a case such as this, the motivation of the employer in the dismissal of the employee is the primary issue to be decided . . . . It is unlikely that either plaintiff or defendant will be able to present any direct evidence of the employer's state of mind in the making of the decision. Thus, critical to this determination would be evidence of how the employer has treated similarly situated employees in the past and how it

17

was treating them at the time of the disputed discharge. This evidence, though circumstantial in nature, is perhaps the best indication, other than the testimony of the parties themselves, of the rationale of the employer for the discharge.

*Id.* at 218. Accordingly, Defendants' comparator evidence may be considered in evaluating whether Defendants would have taken the same action despite the protected conduct.

Alternatively, Plaintiff contends that the comparator evidence reveals that other employees' workers' compensation injuries were substantially less significant than Plaintiff's injury, with the exception of a woman who suffered an amputation but was willing to settle her claim for only $25,000.00, and that other machine operators, working on the same line as Plaintiff, suffered less significant finger injuries without being disciplined. Plaintiff cites the testimony of the plant safety manager in support of this contention, but her testimony reveals little, as she remembered few details about the other employees' accidents and injuries. Elliot Dep. 24-29, 32-33. She did, however, recall that an employee who received a three-fourths amputation of the index finger on his left hand, which was caused by conveyors, was still working at the plant and that his accident was "a totally different situation" from Plaintiff's accident. *Id.* 24:22-26:1. With respect to the woman who suffered the amputation and allegedly returned to work after settling her claim, the employee on whose testimony Plaintiff relies admitted that he did not know whether her injury was the result of violating a safety rule. Nay Dep. 48:2-49:15. Furthermore, there is no evidence that these employees who suffered minor injuries were accused of a safety violation, as was Plaintiff.

The comparator evidence supports Defendants' contention that, generally, Defendants did not terminate employees for filing workers' compensation claims and did terminate employees for violating safety rules. However, the lack of specific information regarding these other incidents

18

limits the comparability to Plaintiff's situation and, correspondingly, limits the strength of the inference that may be drawn from the comparison. Nonetheless, the overwhelming evidence of record supports Defendants' contention that its decision makers (Elliot, Moses, and the plant manager) believed that Plaintiff engaged in a serious violation of safety policy–be it deemed lockout/tagout, two points of control, or being careless or reckless–when he reached his hand into a moving machine and that his employment was terminated for doing so. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'") (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Moreover, Plaintiff has presented nothing more than his own speculation that Defendants' proffered reason for terminating Plaintiff's employment was pretext. *See Fatta*, 727 S.E.2d at 598-99 (granting summary judgment to defendant where plaintiff failed to show that defendant's proffered non-discriminatory reason was pretext). *Cf. McDowell v. Cent. Station Original Interiors, Inc.*, 211 N.C. App. 159, 167, 712 S.E.2d 251, 257 (2011) (concluding that material issue of fact precluded summary judgment where defendant made statements such as we "need to get rid of James before he gets hurt again[;]" and told plaintiff that he hadn't "done nothing but cost the company money. Now [he's] a risk to that company[.]").

In sum, Plaintiff has failed to established a *prima facie* case under REDA or, alternatively, Defendants have presented a legitimate, non-retaliatory reason for terminating Plaintiff's employment, and no reasonable factfinder could conclude, based on the evidence presented, that the

19

proffered reason was pretext, *i.e.*, that Plaintiff's employment was in fact terminated for filing a workers' compensation claim. Therefore, because there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law, it is recommended that Defendants be granted summary judgment on Plaintiff's REDA claim.

## B. Wrongful Discharge Claim

Plaintiff also contends that he was wrongfully discharged in violation of North Carolina's public policy. North Carolina law recognizes a wrongful discharge claim based on a violation of public policy, where the employee was discharged "(1) for refusing to violate the law at the employer's request, . . . (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy[.]" *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 221, 618 S.E.2d 750, 753 (2005) (quoting *Ridenhour v. IBM Corp.*, 132 N.C. App. 563, 568-69, 512 S.E.2d 774, 778 (1999) (internal citations omitted)). *See also* N.C. Gen. Stat. § 143-422.2 ("It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap . . . .").

### 1. Workers' Compensation Claim

Plaintiff alleges that he was terminated for filing a workers' compensation claim in violation of public policy. The filing of a workers' compensation claim is a legally protected activity that may form the basis for a wrongful discharge claim. "Both the Workers' Compensation Act and the Retaliatory Employment Discrimination Act (REDA) are sources of policy establishing an employee's legally protected right of pursuing a workers' compensation claim." *Whitings*, 173 N.C.

App. at 222, 618 S.E.2d at 753. "[A] plaintiff may pursue both a statutory claim under REDA and a common law wrongful discharge claim based on a violation of REDA." *White v. Cochran*, — N.C. App. —, 716 S.E.2d 420, 426 (2011). "Therefore, a plaintiff may state a claim for wrongful discharge in violation of public policy where he or she alleges the dismissal resulted from an assertion of rights under the Workers' Compensation Act." *Whitings*, 173 N.C. App. at 221, 618 S.E.2d at 753 (quoting *Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 259-60, 580 S.E.2d 757, 762 (2003)). "The plaintiff has the burden of pleading that the dismissal was causally related to the protected activity." *Id.* (citing *Salter*, 155 N.C. App. at 693, 575 S.E.2d at 51).

Plaintiff's wrongful termination claim is dependent upon the viability of his REDA claim. *See Smith*, 568 F. Supp. 2d at 621 (citing *Johnson v. Pepperidge Farm, Inc.*, No. 93-1386, 1994 WL 118100, at *4 (4th Cir. Apr. 4, 1994) (additional citations omitted)). Therefore, because it is recommended that Defendants be granted summary judgment on Plaintiff's REDA claim, it is also recommended that Defendants be granted summary judgment on Plaintiff's wrongful termination claim with respect to the filing of his workers' compensation claim.

### 2. Disability

Plaintiff alleges that he was terminated because he is disabled in violation of public policy. North Carolina law recognizes that a termination based on an employee's disability in violation of the North Carolina Equal Employment Practices Act, N.C. Gen Stat. § 143–422.2, *et seq.,* may serve as the basis for a wrongful discharge claim. *Sidhu v. Cancer Ctrs. of N.C., P.C.*, No. 5:12-CV-603-FL, 2013 WL 2122958, at *4 (E.D.N.C. May 15, 2013) (citations omitted). "In evaluating state law discrimination claims, North Carolina courts 'look to federal decisions for

21

guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases.'" *Jefferson v. Biogen Idec Inc.*, No. 5:11-CV-237-F, 2012 WL 3629219, at \*7 (E.D.N.C. Aug. 22, 2012) (quoting *Dep't of Corr. v. Gibson*, 308 N.C. 131, 136, 302 S.E.2d 78, 82 (1983)). "Accordingly, when faced with state law wrongful discharge on the basis of handicap/disability claims, courts utilize the evidentiary framework used in evaluating disability discrimination claims under the ADA." *Id.* (citing *Youse v. Duke Energy Corp.*, 171 N.C. App. 187, 193, 614 S.E.2d 396, 401 (2005) (approving the evidentiary scheme used in evaluating claims for disability discrimination under the ADA for wrongful discharge claims on the basis of handicap)); *Morris v. BellSouth Telecomm.*, 302 F. Supp. 2d 515, 524–25 (M.D.N.C. 2004) ("[S]tate law claims for wrongful termination for discharge due to handicap are analyzed with the same burden shifting test as claims brought under the ADA.")).

To prevail on a wrongful termination claim based on disability, the Plaintiff must establish a *prima facie* case, which requires evidence showing that

(1) []he is disabled; (2) []he suffered an adverse employment action; (3) at the time of the adverse employment action, []he was meeting h[is] employer's legitimate expectations; and (4) the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination. *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). If the plaintiff successfully establishes a prima facie case, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for its action. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003). If the employer does so, the plaintiff then bears the burden of proving by a preponderance of the evidence that the employer's proffered reason for the termination is a mere pretext for unlawful discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). A plaintiff "can prove pretext by showing that the [employer's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [disability discrimination]." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotations omitted).

*Jefferson*, 2012 WL 3629219, at *7.

Plaintiff failed to respond to Defendants' motion for summary judgment as to this claim. However, "even when the adverse party fails to respond to the motion for summary judgment, the court must review the motion and the materials before the court to determine if the moving party is entitled to summary judgment as a matter of law." *Meyer v. Qualex, Inc.*, 388 F. Supp. 2d 630, 634 (E.D.N.C. 2005). Here, Plaintiff cannot establish a *prima facie* case, because there is no evidence in the record that the adverse employment action occurred under circumstances giving rise to a reasonable inference of unlawful discrimination with respect to Plaintiffs' disability. Furthermore, as discussed above, Defendants have proffered a legitimate, non-discriminatory reason for terminating Plaintiff's employment, which Plaintiff has failed to show is pretext. Therefore, because there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law, it is recommended that Defendants be granted summary judgment on Plaintiff's wrongful discharge claim on the basis of disability.

### 3. Race and National Origin

Finally, Plaintiff alleges in his complaint that he was terminated on the basis of his race and national origin in violation of public policy. North Carolina law recognizes a claim for wrongful termination based on race or national origin, and applies the framework for Title VII claims. *Traywick v. First Citizens Bank & Trust Co.*, No. 5:07-CV-198-BR, 2008 WL 2570865, at *3 (E.D.N.C. June 25, 2008).

> To establish a *prima facie* case of wrongful termination based on race [or national origin], plaintiff may either present direct or circumstantial evidence of a discriminatory motive or []he may use the burden shifting analysis set forth by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-804, 93

23

Case 5:12-cv-00049-FL   Document 30   Filed 07/26/13   Page 23 of 25

S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213-14 (4th Cir. 2007). [Where] [p]laintiff has not alleged any direct or circumstantial evidence of discriminatory motive . . ., plaintiff must show that: (1) []he is a member of a protected class; (2) []he suffered adverse employment action; (3) at the time of the adverse employment action, plaintiff was performing satisfactory work that met h[is] employer's legitimate job expectations; and (4) following plaintiff's termination, defendant hired a similarly qualified applicant outside plaintiff's protected class to fill the vacancy. *Id.* at 214.

Once plaintiff has established this *prima facie* case of race discrimination, the burden of production shifts to defendant to show a legitimate, non-discriminatory reason for plaintiff's termination. *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004)(en banc)). Once defendant has produced evidence of a legitimate reason, the burden shifts back to plaintiff to prove that defendant's proffered reason is merely a pretext for discrimination. *Id.* Plaintiff may demonstrate pretext "by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

*Id.*

Plaintiff failed to respond to Defendants' motion for summary judgment as to this claim, and there is no evidence in the record to support that Plaintiff's employment was terminated based on his race or national origin. Plaintiff has presented no evidence that Defendants hired a similarly qualified applicant outside Plaintiff's protected class to fill the vacancy created by his termination and, therefore, has failed to establish a *prima facie* case of wrongful termination based on race or national origin. *Id.* Therefore, because there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law, it is recommended that Defendants be granted summary judgment on Plaintiff's wrongful discharge claim on the basis of race or national origin.

## IV.    CONCLUSION

For the reasons stated above, it is RECOMMENDED that Defendants' motion for summary judgment [DE-21] be GRANTED.

24

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the **25** day of July 2013.

Robert B. Jones Jr.
United States Magistrate Judge